## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

---

**ANDRAS GRUBER,**

        **Plaintiff,**

    **v.**                          **Case No. _____**

**OREGON HEALTH AND SCIENCE UNIVERSITY, and DANNY JACOBS,**

        **Defendants.**

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Andras Gruber (hereinafter referred to as "Plaintiff" or "Gruber"), by his attorneys Nesenoff & Miltenberg, LLP and Karmel Savage, PC, as and for his complaint against Defendants Oregon Health and Science University ("OHSU" or the "University") and Danny Jacobs ("Jacobs"), respectfully alleges as follows:

### THE NATURE OF THE ACTION

1. This action arises out of the wrongful and unlawful actions taken against Plaintiff by Defendants when he was subjected to a sloppy, flawed, rushed, and biased Title IX sexual misconduct process, which was carried out under the presumption of Plaintiff's guilt as a male accused.

2. Prior to the events described herein, Plaintiff was a well-loved professor and researcher at OHSU with an upstanding reputation in the biomedical engineering ("BME") community. Defendants' actions which led to erroneously finding Plaintiff responsible for sexual

misconduct have tarnished Plaintiff's career opportunities and caused him to suffer severe emotional distress.

3.      From the start, OHSU's Title IX investigation was plagued with flaws, bias, and overreach. For example, the credibility of the accuser, Jane Roe[1], was never questioned by the University investigator despite clear contradictions to her story. Instead, the University took the accuser's statements at face value in order to paint a story which would produce a finding of responsibility for Plaintiff.

4.      The entire process was disorganized, rushed, flawed, and careless, and resulted in the erroneous finding of responsibility and sanction of termination from the University.

5.      The University's investigation and adjudication of the allegations were tainted by gender bias resulting from federal and local pressure to protect female "victims" of sexual misconduct, and to reform OHSU's policies to take a hardline stance against male students and faculty accused of sexual misconduct. As a result, Plaintiff was deprived of an adequate opportunity to defend himself against the charges.

6.      Defendants' conduct herein subjected Plaintiff to reputational harm, distress, and significant economic harm, including without limitation lost earnings, loss of future earnings, and loss of career prospects. Defendants' conduct will continue to have long-term and severe consequences for Plaintiff.

7.      Due to the Defendants' miscarriage of justice, Plaintiff has now been labeled a sex offender and has been ostracized by professional colleagues and students. Plaintiff has suffered and will continue to suffer ongoing reputational harm due to Defendants' conduct.

---

[1] Jane Roe is a pseudonym.

8.      Accordingly, Plaintiff now brings this action to obtain monetary and injunctive relief.

## THE PARTIES

9.      Plaintiff is a natural person and resident of Oregon.

10.      Defendant OHSU is a federally funded public university located in Portland, Oregon, where it maintains its principal offices and place of business.

11.      Defendant Jacobs is a natural person and resident of Oregon. During the events described herein, Defendant Jacobs was the President of OHSU and responsible for maintenance of disciplinary records at OHSU.

## JURISDICTION AND VENUE

12.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the constitution and statutes of the United States.

13.      This Court has personal jurisdiction over Defendants OHSU and Jacobs on the ground that they are conducting business within the State of Oregon.

14.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.   **BACKGROUND.**

A.   **The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

15.   On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

16.   The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

17.   The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

18.   Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

19.   On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a trauma informed approach, advising, for example, that hearings

should be "conducted in a manner that does not inflict additional trauma on the complainant."

https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

20.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. Id. at 25-31.

21.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.    The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

22.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct.

23.     Colleges and universities, including OHSU, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like OHSU, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

**B.     The 2017 Revocation of the DCL**

24.     On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration

reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

25.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

26.     The 2017 Q&A suggests that the policies and procedures in place at OSHU at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

27.     On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, OHSU did not change its Title IX procedures. *See Letter from President Altmann,* available at https://www.fandm.edu/uploads/files/97165955810576512-altman-ltr.pdf.

C.     **The 2020 Title IX Final Rule**

28.     On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX

Final Rule") which carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

29.    The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

30.    The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including the right to a live hearing with cross-examination of all witnesses. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

31.    In light of the 2020 Title IX Final Rule, OHSU updated its Title IX Policy as of August 2020.

**D.    OHSU Faces Years of Complaints for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty**

32.    For years, OHSU has faced student pressure regarding its failure to adequately address sexual misconduct complaints made against male students and faculty.

33.    Indeed, in the months directly leading up to OHSU's investigation of Plaintiff, OHSU students, as well as the public at large, openly accused the University of not taking its allegations of sexual misconduct seriously, and failing to adequately punish perpetrators of sexual assault on campus.

34.    In 2021, the University's actions, or lack thereof, drew national media scrutiny, when a social worker sued OHSU, claiming that the University failed to take action on her complaint of sexual assault against an OHSU anesthesiology resident, and instead attempted to sweep the allegations under the rug. *See OHSU announces $585,000 settlement of suit that alleged*

*sexual harassment by TikTok Doc*, Oregon Live (May 11, 2021), available at https://www.oregonlive.com/portland/2021/04/ohsu-announces-585000-settlement-of-suit-that-alleged-sexual-harassment-by-tiktok-doc.html.

35.    OHSU settled with the complainant for $585,000, and issued a public apology which stated, amongst other things, "OHSU *recognizes the need to address systemic structures that allow inappropriate and damaging behavior to exist*, and is committed to creating a safe and inclusive environment that is free of harassment and discrimination." *Id*. (emphasis added).

36.    The University faced multiple protests, again regarding the University's failure to respond to complaints of sexual assault brought by women on campus. *See OHSU Employees Take Public Stand In Sex Assault Case, Moving Alleged Victim To Tears*, The Lund Report (Mar. 4, 2021), available at https://www.thelundreport.org/content/ohsu-employees-take-public-stand-sex-assault-case-moving-alleged-victim-tears.

37.    At the rally, protesters held signs that said "stop violence against women" and "50% of us fear retaliation." *Id.*

38.    OHSU faculty further highlighted the "pattern" at OHSU: "Victims report misconduct or discrimination, the university investigates, offenders keep their jobs or are moved, victims suffer retaliation or isolation and nothing changes." *Id.*

39.    President Danny Jacobs responded directly to the protests, stating: "We are committed to an environment where all members feel safe, have a sense of belonging and have access to what they need to thrive. But we certainly have more work to do. I want to be sure my expectations are very clear: We must remain vigilant about monitoring and addressing the power dynamics and other factors that allow harassment and other such unacceptable behaviors to occur." *Id.*

40.     The University then hired the law firm of former U.S. Attorney General Eric Holder to perform a six-month independent investigation of OHSU's handling of sexual misconduct complaints. *Id*.

41.     The University again caused public outrage when Holder's outrageously high hourly fee, which exceeded $2,000 per hour, was revealed. The University's flagrant spending prompted Oregon lawmakers to propose a new bill which states that "the cost of any private counsel employed by a state agency cannot exceed the greater of 200% of the standard hourly rate charged by the attorney general for the same services or a rate established by the attorney general for the specific purpose." See Former AG Eric Holder's $2,295 an hour rate for OHSU investigation drawing outrage. Oregon Live (Apr. 21, 2021), available at https://www.oregonlive.com/education/2021/04/former-ag-eric-holders-2295-an-hour-rate-for-ohsu-investigation-drawing-outrage.html.

42.     Notably, OHSU's contract with Holder stated that Holder's firm would "design a survivor-centered, trauma-informed investigative workplan based on our professional judgment and provide to the University our independent findings and recommendations once we have reached them." See OHSU to pay more than $2,000 per hour to investigators of sexual harassment, discrimination claims, OPB (Apr. 17, 2021), available at https://www.opb.org/article/2021/04/17/oregon-health-science-university-sexual-harassment-discrimination-claims/.

43.     The report was completed in December of 2021, and determined that OHSU had issued with the implementation of its complaint investigation procedures. The report called on OHSU to make misconduct policies clearer and strengthen accountability measures. See OHSU releases law firm's investigation into misconduct policies, workplace culture, KGW8 (Dec. 9,

2021), available at https://www.kgw.com/article/news/local/ohsu-misconduct-law-firm-investigation-report/283-dedd3e80-a287-4575-91f1-29437181750a.

44.     In response to the report, OHSU's president, Danny Jacobs, stated that "none of the themes surprised [him]" and promised "lasting changes" in OHSU's response to complaints of sexual misconduct. *Id*.

45.     On information and belief, following the media chastisement that OHSU received in 2021, OHSU sought to prove: (1) that OHSU would aggressively pursue complaints of sexual misconduct; and (2) that the money spent on Holder's firm for the investigation and report was not spent in vain. Unfortunately for Plaintiff, he would become the scapegoat that the University used to prove these points.

46.     On information and belief, the past media coverage, and the internal investigation, *which was still ongoing when allegations of sexual misconduct were brought against Plaintiff*, prompted OHSU to take a hardline stance against Plaintiff, as a male accused, in order to make up for its past wrongs, and to paint the picture that the allegations against Plaintiff were being pursued aggressively.

47.     On information and belief, OHSU felt pressure to "overcorrect" and use Plaintiff as an example of its decision to take allegations of sexual assault seriously.

48.     On information and belief, OHSU's leadership exerted pressure, ideological and otherwise, to find against males accused of sexual misconduct and deprive them of due process.

49.     On information and belief, OHSU was responding to pressure from the University's leadership and from local and student media when they rushed to find Plaintiff responsible against the weight of evidence.

50.     Plainly, the University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus.

51.     On information and belief, OHSU has repeatedly conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male faculty and students accused of misconduct.

## II.     CHRONOLOGY OF EVENTS

### A.  Plaintiff

52.     Plaintiff has been part of OHSU since 2004, and has worked as a successful BME professor.

53.     Throughout his time at OHSU, and up until the events described herein, Plaintiff maintained a spotless disciplinary record.

54.     Moreover, Plaintiff's faculty evaluations had consistently been positive, receiving the highest scores.

55.     In addition to serving as professor at OHSU, Plaintiff also works with a company, which develops medicines for blood diseases with significant unmet medical need.

56.     Plaintiff and employees of his company's conduct research, which is largely funded by the National Institutes of Health ("NIH").

57.     As such, maintaining an upstanding reputation is critical for both Plaintiff's career as professor as well as the success of his company.

### B.  OHSU's Flawed Investigation Against Plaintiff

58.     Plaintiff and Roe both worked at OHSU, although they did not maintain a close relationship.

59.     Indeed, Plaintiff and Roe had only exchanged a few cordial words with each other on occasion.

60.     On one occasion, Gruber and Roe went to lunch together as colleagues.

61.     Throughout this lunch, Gruber and Roe exchanged friendly words and mostly discussed work.

62.     After this lunch, and for *three years*, Roe never expressed any discontent with Plaintiff or their interaction at lunch.

63.     However, at some point in the Fall of 2018, Plaintiff made a complaint about Roe bringing her dog into the office.

64.     As a result, on information and belief, Roe was told that she could no longer bring her dog into the office.

65.     In August of 2021, *after* Plaintiff made this complaint regarding Roe's dog, Roe then went to OHSU's Public Safety office and alleged, for the first time in three years, that: (i) Plaintiff made sexually explicit statements to Roe while at lunch on May 3, 2018; and (ii) Plaintiff touched Roe's groin area inappropriately when on the elevator after lunch on May 3, 2018.

66.     On information and belief, Roe falsified allegations against Plaintiff *three years after the alleged incident* because she was upset that Plaintiff did not like Roe having her dog in the office.

67.     Roe was subsequently interviewed regarding her complaint by OHSU Public Safety Officer Marshall and Lieutenant Mudrick on August 20, 2021 and September 17, 2021.

68.     On September 3, 2021, Roe conducted a pretext call to Plaintiff, where Plaintiff learned of Roe's allegations from three years prior for the first time.

69.    Plaintiff, shocked and blindsided, denied the allegations and told Roe that he did not recall any of the events which she alleged.

70.    Indeed, while Roe seemed to allege that the events occurred specifically on May 3, 2018, Plaintiff's credit card records could not verify Roe's claims, as they show that he already purchased lunch on the day in question at a location that could not match Roe's claims.

71.    On information and belief, due to Plaintiff's resistance of Roe bringing her dog into the office, Roe set out on a smear campaign to have Plaintiff's removed from OHSU and to ruin his upstanding professional reputation.

72.    After Roe's shocking and strange phone call, Plaintiff did not receive any further contact regarding Roe's allegations for weeks.

73.    Indeed, despite the fact that Roe made her initial report in August 2021 and therefore OHSU was well aware of the allegations, Plaintiff did not receive contact from OHSU regarding Roe's formal complaint until September 20, 2021, over one month later.

74.    Worse, when Plaintiff did receive contact from OHSU, his side of the story was not given any weight at all.

75.    Indeed, on September 20, 2021, while Plaintiff was out of the country, he received a voicemail from Fiona Canova ("Canova"), HR Director of the School of Medicine, informing him of Roe's allegations.

76.    Canova then emailed Plaintiff that same day, informing Plaintiff that due to Roe's allegations, he was being placed on administrative leave, *before any findings were made*.

77.    Plaintiff was never given proper notice of the allegations, nor was he given an opportunity to defend himself before being removed from the University and told that he could not return to work while the investigation was ongoing.

78.     As a result, Plaintiff was deemed guilty from the start as a male accused, and Roe's allegations as the female accuser were taken as true at face value.

79.     The email further stated that OHSU's Public Safety department was conducting an investigation of Roe's claims.

80.     The email made no mention of an OHSU University investigation, and accordingly, Plaintiff was not put on notice of any such investigation.

81.     On September 22, 2021, Plaintiff received a phone call from OHSU Public Safety, requesting an interview from Plaintiff regarding Roe's allegations.

82.     On the phone call, OHSU Public Safety indicated that it was conducting a criminal investigation, separate and apart from any University investigation.

83.     Accordingly, Plaintiff thought at the time that there was no University investigation occurring.

84.     To Plaintiff's surprise, however, on September 28, 2021, Plaintiff received an email from April Cuprill-Comas ("Cuprill-Comas"), OHSU's general counsel, indicating that OHSU *was* undertaking its own investigation, and working with OHSU Public Safety in the process.

85.     Cuprill-Comas stated that OHSU had received a finding of probable cause from Public Safety.

86.     The email went on to state *affirmatively* that Plaintiff had violated OHSU's policies by making sexually explicit statements to Roe.

87.     Cuprill-Comas's email demonstrated a presumption of guilt of Gruber, as a male accused, even before any formal findings had been made.

88.     The email then went on to state that an external investigator was to be appointed to investigate the claims, and that formal termination process had been initiated against Plaintiff.

89.     In other words, with *no findings made*, OHSU presumed Gruber guilty and began the termination process even before an investigation was complete.

90.     Further, despite an ongoing criminal investigation, and therefore Gruber's inability to meaningfully take part in a University investigation without impairing his Fifth Amendment Rights, the University refused to stay the proceedings until the conclusion of the criminal investigation.

91.     After Cuprill-Comas's email, due to the initiation of the formal termination process, Plaintiff's entire body of scientific work had been erased from the OHSU website, effectively removing Plaintiff from his position before any formal findings had been made.

92.     Plaintiff then communicated to his company colleagues that he had been accused of sexual assault by Roe, because Plaintiff knew that any public dissemination of information about the allegations would cause severe consequences to his company and the company's employees. Indeed, NIH could limit or terminate grant funding to his employer altogether, as most of his research has been funded by the NIH.

93.     On November 8, 2021, the OHSU police department filed the police report in Plaintiff's matter to the Mulnomah County District Attorney's Office

94.     The police report was almost entirely based off of interviews with individuals that Roe provided as witnesses, and accused Plaintiff of Sexual Abuse in the Third Degree and Harassment – Disorderly Conduct.

95.     Plaintiff was arraigned on December 7, 2021 for Sexual Abuse in the Third Degree. Plaintiff was not formally charged with Harassment.

96.     Shortly after, OHSU investigator, Jill Goldsmith, issued her first draft of the investigation report.

97.    Goldsmith's report relied almost entirely on the statements of Roe and her witnesses, along with the one-sided police report, taking these claims at face value and ignoring any credibility issues. On information and belief, Goldsmith did not seek out exculpatory information, and instead only cherry-picked evidence and statements that would corroborate Roe's claims.

98.    Indeed, Roe solely relied upon witnesses to whom Roe allegedly reported the encounter after the fact, and who merely recited Roe's fabricated story.

99.    Worse, the investigation report included new unfounded accusations of sexually explicit statements allegedly made by Plaintiff *prior* to the alleged May 3, 2018 lunch incident, which Plaintiff had not been made aware of and therefore had no opportunity to defend.

100.    At that point, given the biased investigation report and the termination process which had been started by OHSU in September by placing Plaintiff on administrative leave and removing Plaintiff from the OHSU website, Plaintiff made the decision to resign from his position at OHSU.

101.    On information and belief, even after Plaintiff resigned from his position, OHSU and its administration continued to attempt to inflict as much damage to Plaintiff's image and his company as possible, in an effort to please Roe and remedy its past failure to address complaints of sexual misconduct.

102.    Indeed, Plaintiff's attorney at the time requested that OHSU issue a statement stating that Plaintiff left OHSU to pursue new directions in his career. However, OHSU never responded.

103.    The University allowed Plaintiff to go to his office to retrieve his belongings, but only under police escort, which was both humiliating for Plaintiff and damning to his reputation.

Significantly, at this time, there had still been no formal findings either in the criminal investigation or the OHSU investigation, and thus, the University presumed Plaintiff responsible from the start.

104.   When Plaintiff did retrieve his computer, he was locked out of his OHSU account, and OHSU had encrypted the files on Plaintiff's computer so that Plaintiff could not even make copies of his own research. Many of the files contained information that could be valued only by further investment and research into the matters, some of which had significant potential value.

105.   Plaintiff subsequently gave his computer back to the OHSU police department for purposes of the criminal investigation. Although Plaintiff has an external drive of his files, he is unable to read any of the files as the entire drive is encrypted.

106.   The loss of these files was devastating to Plaintiff, as his company is based entirely on Plaintiff's research and ideas. Most of Plaintiff's innovative concepts pre-dated his employment at OHSU, however, Plaintiff stored his work on his OHSU devices.

107.   Plaintiff's files included emails, many of them professional and critical for his work, old documents, financial and personal data, family data and documents, photocopies, diplomas, all of his work of about 40 years at various institutions, contracts, confidential material, government documents, including United States and foreign patents and patent applications, new scientific concepts, letters, company information and files, and more.

108.   By refusing access or the ability to copy these files, OHSU essentially deprived Plaintiff of everything he had created in his career, before he had ever even been found formally responsible.

109.   In addition, by locking Plaintiff out of his computer, OHSU was also functionally encumbering Plaintiff's ability to defend himself from the allegations by forcing him to access information through a costly and time-consuming subpoena process.

110.    On December 17, 2021, Goldsmith issued her final investigation report, which only served to highlight the belief of Roe as the female accuser, despite clear inconsistencies in her stories, and the presumption of guilt held against Plaintiff as the male accused. By way of example, and not limitation:

a.    In the final investigation report, Roe made new allegations concerning Plaintiff's alleged comments to Roe's coworker prior to the alleged incident. When interviewed about the comments, Roe's coworker said that the statements *did not bother her*. Still, Goldsmith found Plaintiff responsible for sexual harassment.

b.    Roe claimed that even before the alleged incident, she had one of her coworkers come into the room and interrupt whenever Gruber was in her office because she was uncomfortable with Gruber. This coworker, however, stated that she did not come in Roe's office to interrupt prior to the alleged incident. Goldsmith *still* accepted Roe's allegations, found Plaintiff responsible for sexual harassment, and incredibly stated "this is likely just a mistake on [Roe's] part."

c.    Gruber provided Goldsmith with emails after the alleged incident, demonstrating that Roe maintained a perfectly friendly relationship with Plaintiff after she claimed to have been assaulted. Goldsmith again explained this exculpatory evidence away, stating "these emails do not impugn [Roe's] integrity in this matter. It would not be unusual for an individual to try to maintain friendly relationships at work."

111.    Interestingly, the final investigation report failed to explain why Roe failed to bring her allegations forward for nearly three years, or why these allegations only came after Plaintiff complained about Roe bringing her dog into the office.

112.    Goldsmith's final investigation report ultimately found Plaintiff responsible for sexual harassment and violation of the OHSU Code of Conduct.

113.    As a result, Plaintiff's personnel file is marred with a finding of responsibility for sexual harassment, making it nearly impossible for Plaintiff to obtain meaningful employment elsewhere.

114.    Worse, the final investigation report offered no opportunity for Plaintiff to appeal the findings.

115.    The destruction of Plaintiff's career prospects was still not enough for Roe, and, on information, and belief, Roe demanded that OHSU personnel send a press release on the allegations.

116.    On information and belief, at Roe's direction, Owen McCarty sent an email to the OHSU BME department, stating:

Dear Department of Biomedical Engineering Members,

I am emailing to update you on the departure of Andras Gruber, M.D., professor of biomedical engineering, who joined OHSU in 2004.

OHSU placed Dr. Gruber on administrative leave and initiated formal termination proceedings on Sept. 28, 2021 relating to allegations that Dr. Gruber violated OHSU Policy No. 03-05-035—Sexual Harassment and the OHSU Code of Conduct by sexually assaulting an OHSU employee. A criminal and internal investigation substantiated the underlying factual allegations. Dr. Gruber opted not to pursue his right to a hearing pursuant to OHSU Policy No. 03-70-005 and was separated from employment effective Dec. 13, 2021. The remaining criminal allegations were referred to the Multnomah County District Attorney. The University has notified the National Institute of Health (NIH), including public and private partners through which Dr. Gruber received NIH funding, of these facts.

OHSU, I personally, and your chair, Dr. McCarty, deeply regret the trauma this incident has caused. We are focused on supporting the survivor's individual safety, healing and well-being.

I realize that bringing a complaint of sexual assault or sexual harassment is emotionally difficult, but note the importance of bringing complaints to light so that they can be investigated and so those that do not meet our standards of conduct are properly held accountable.

117.    When this email was sent, however, this statement was false, as the criminal investigation was *still ongoing*, therefore no findings had been made, so the criminal investigation could not possibly have "substantiated" Roe's allegations.

118.    Indeed, at the time the statements were made, the criminal investigation was in the open discovery phase following arraignment, and Plaintiff had not been tried nor convicted.

119.    Thus, the statements made by Defendants were patently false, and in direct contradiction with the due process rights afforded to Plaintiff as a criminal defendant.

120.    On information and belief, Defendants' defamatory statements, claiming that the criminal investigation had substantiated findings of sexual assault, were intended to destroy Plaintiff's professional reputation and to prove to the public that OHSU was committed to aggressively pursuing allegations of sexual assault following recent media scandals.

121.    On information and belief, OHSU also spread this information to individuals and organizations, including NIH, via phone calls and other electronic communications.

122.    In other words, on information and belief, OHSU used Plaintiff as a scapegoat to prove its commitment to Title IX in an attempt to clean up its public image.

123.    On January 3, 2023, after open discovery was conducted, and after presenting the District Attorney's Office with this information, the charges against Plaintiff were formally dropped.

124.    Had OHSU stayed the proceedings against Plaintiff until the conclusion of the University investigation, it would have had sufficient information to conclude that Roe's allegations were indeed unsubstantiated. Instead, OHSU rushed to judgment to have Plaintiff found responsible as a male accused.

### III.    PLAINTIFF'S DAMAGES

125.    As a direct and proximate result of Defendants' biased, unlawful, negligent, and improper conduct, Plaintiff was wrongly found responsible for engaging in sexual harassment, and such a finding has been made part of Plaintiff's personnel records.

126.    These notations of responsibility forever mar Plaintiff's records, especially in the wake of the powerful #MeToo movement, characterizing him as a sexual predator.

127.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future.

128.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

129.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

130.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, which will be forever noted on Plaintiff's records.

131.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damage to his future career prospects.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Erroneous Outcome**
**(Against Defendant OHSU)**

132.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

133.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

134.    Upon information and belief, OHSU, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

135.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant OHSU.

136.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

137.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

138.    Several categories have been observed to challenge university disciplinary proceedings for sex discrimination, including "erroneous outcome" cases, in which the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings.

139.    OHSU violated Title IX in the instance case because the University reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

140.    Facts casting much more than an "articulable doubt" on the accuracy of the outcome are described in detail above; they include, but are not limited to, the following:

      a.   From the start, the investigation was slanted in favor of the complainant. The complainant's story was deemed credible from the beginning and given more weight in the final analysis and determination in what occurred on the day of the alleged incident. In that regard, OHSU took the complainant's statements at face value, and put the burden on Plaintiff to disprove the allegations;

b.  OHSU relied heavily on Roe's statements, and failed to give adequate weight to exculpatory evidence, such as Plaintiff's credit card records which indicated he likely was not even with Roe on the day she alleged the incident occurred;

c.  OHSU discounted statements made by Roe's own witnesses which contradicted and disproved Roe's allegations as merely a "mistake";

d.  The conclusion reached by Goldsmith was not supported by a preponderance of the evidence;

e.  OHSU failed to stay the proceedings until the conclusion of the criminal investigation to allow Plaintiff to have a proper opportunity to be heard;

f.  OHSU immediately suspended Plaintiff from his position at OHSU and initiated termination based merely off one-sided allegations made by Roe;

g.  OHSU failed to investigate Roe's motive to falsify allegations, including that Roe's allegations were only made after Plaintiff complained about Roe bringing her dog into the office; and

h.  OHSU failed to give Plaintiff an opportunity to appeal the decision.

141.    There was a particularized causal connection between the erroneous outcome in Plaintiff's case and gender bias. Facts sufficient to plead the existence of this bias and its connection to the erroneous outcome have already been alleged in the Complaint in detail and are include, without limitation, the following:

a.  Beginning in 2014 and through the time when Roe's complaint was investigated, OHSU was subject to immense federal, local, and campus pressure to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct claims, and issue more severe sanctions to those found responsible for sexual misconduct. Such pressure included ongoing OCR investigations, lawsuits filed against OHSU, and student and/or faculty outcry regarding OHSU's compliance with Title IX and lack of follow-through;

b.  Years of pressure and criticism from faculty and students geared towards OHSU's perceived failure to protect females from sexual misconduct;

c.  OHSU's desire to avoid more national media attention for its failure to respond to complaints of sexual misconduct brought by female students and faculty;

    d.   OHSU's administration and leadership exerted pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise; and

    e.   OHSU's support and employment of a trauma-informed, believe all women approach to sexual misconduct allegations. Upon information and belief, OHSU's administration received trauma-informed investigation and adjudication training, which perpetuated the idea that victims of sexual assault should never be questioned, that trauma excuses all memory lapses and credibility issues, and that complainants always tell the truth. This approach caused OHSU to overlook exculpatory evidence and rush to have Plaintiff, as the male perpetrator, removed from his position on campus.

142.    Upon information and belief, OHSU's mishandling of Plaintiff's case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

143.    OHSU applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous outcome.

144.    OHSU also imposed an unwarranted and unjustly severe sanction on Plaintiff, and gender bias was a motivating factor, for the same reasons as described above.

145.    As discussed above, the public pressure on OHSU to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female and against him, the male.

146.    Upon information and belief, OHSU has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

147.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and be punished severely for it.

148.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: loss of future career opportunities, reputational damages, economic injuries and other direct and consequential damages.

149.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing OHSU to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his disciplinary/personnel records; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
**42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process**
**(Against Defendant Jacobs)**

150.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

151.    Upon information and belief, Defendant Jacobs is the OHSU official charged with ensuring that faculty personnel records are disclosed to third-party requesters.

152.    Upon information and belief, Jacobs is also the OHSU official responsible for the conferral of tenure appointments to OHSU faculty.

153.    Jacobs was responsible for implementing the policies and procedures at issue in Plaintiff's case.

154.    Jacobs was responsible for implementing and maintaining the OHSU Office of Conduct and OHSU Public Safety, including the general counsel and investigators, overseeing their work and ensuring OHSU's compliance with Title IX and other applicable laws. Cuprill-Comas reported to Jacobs, and, on information and belief, provided him with statistics on sanctions issued for sexual misconduct violations at OHSU.

155.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

156.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

157.    A person has a protected property interest in pursuing the career of his choice, of which he cannot be deprived without due process.

158.    Plaintiff's constitutionally protected property interest in his continuous employment and to be free from arbitrary termination and dismissal arises from the policies, courses of conduct, practices, and understandings established by OHSU.

159.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between OHSU and Plaintiff.

160.    It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

161.    OHSU is a state university with its principal administration offices in Portland, Oregon.

162.    Plaintiff had obeyed all institutional rules when he was wrongly terminated from OHSU.

163.    Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he was facing. Plaintiff was deprived of a fundamentally fair process.

164.    Plaintiff's right to due process was violated when the University initiated termination of his employment before any findings had been made and before Plaintiff had a fair opportunity to be heard.

165.    Further, Plaintiff's right to due process was violated when the University issued a false press release stating that the allegations against him were "substantiated" by a criminal investigation, thereby ruining Plaintiff's hard-earned reputation and foreclosing Plaintiff's ability to seek employment outside of OHSU.

166.    Throughout the University investigation, Plaintiff could not meaningfully defend himself without infringing on his Fifth Amendment Rights due to the parallel criminal investigation. Notwithstanding, the University refused to stay the proceedings until the conclusion of the criminal investigation, foreclosing Plaintiff's ability to be heard.

167.    Given the seriousness of the allegations and the consequences of the finding of responsibility, the University should have afforded Plaintiff a fair opportunity to be heard.

168.    By denying Plaintiff the opportunity to be heard in a fair investigation before he was placed on leave or termination proceedings were initiated, OHSU violated Plaintiff's due process rights.

169.    OHSU failed to provide Plaintiff with the basic due process protections that it was required to provide faculty accused of sexual misconduct at a state university.

170.    OHSU, Jacobs, as well as other agents, representatives, and employees of OHSU intentionally, willfully, wantonly, oppressively, and maliciously violated Plaintiff's due process rights.

171.    OHSU deprived Plaintiff of the requisite due process because the University has a pecuniary interest in the outcome of the adjudication. Specifically, OHSU was under immense pressure given ongoing OCR investigations into noncompliant universities, and risked the loss of federal funding or other penalty if they found in favor of Plaintiff.

172.    Based on the foregoing, OHSU violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of Roe's allegations.

173.    As a result of the foregoing, Plaintiff is entitled to prospective injunctive relief expunging Plaintiff's disciplinary record; removing any record of the findings from his personnel file; and destroying any and all records pertaining to Jane Roe's complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Andras Gruber demands judgment against Defendants OHSU and Jacobs as follows:

(i)     On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing OHSU to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding from his personnel file/disciplinary records; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for violation of constitutional due process under 42 U.S.C. § 1983, an injunction directing Jacobs to (i) expunge Plaintiff's disciplinary record; (ii) remove any record of the finding from

Plaintiff's personnel file; and (iii) permanently destroy any record of Jane Roe's complaint;

(iii) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated: New York, New York**
    **December 15, 2023**

         **Respectfully submitted,**

         **NESENOFF & MILTENBERG, LLP**
         *Attorneys for Plaintiff*

         **By: /s/ Andrew T. Miltenberg**
          **Andrew T. Miltenberg, Esq.**
          **Stuart Bernstein, Esq.**
          **Kristen Mohr, Esq.**
          **363 Seventh Avenue, Fifth Floor**
          **New York, New York 10001**
          **(212) 736-4500**
          **amiltenberg@nmlllplaw.com**
          **sbernstein@nmlllplaw.com**
          **kmohr@nmlllplaw.com**

         **KARMEL SAVAGE, PC**
         *Attorneys for Plaintiff*

         **By: /s/ Elizabeth C. Savage**
          **Elizabeth C. Savage, Esq.**
          **OSB #141157**
          **1023 SW Yamhill Street, Suite #200**
          **Portland, Oregon 97205**
          **New York, New York 10001**
          **(503)295-2486**
          **Elizabeth@karmelsavage.com**